1  Paul A. Kampmeier, WSBA #31560
   KAMPMEIER & KNUTSEN PLLC
2  615 Second Avenue, Suite 360
3  Seattle, Washington 98104
   Telephone:  (206) 223-4088 x 4
4  Email:  paul@kampmeierknutsen.com

5  Brian A. Knutsen, WSBA # 38806
   KAMPMEIER & KNUTSEN PLLC
6  833 S.E. Main Street, No. 318
7  Portland, Oregon 97214
   Telephone:  (503) 841-6515
8  Email:  brian@kampmeierknutsen.com

9  *Attorneys for Plaintiff Olympic Forest Coalition*

10

11            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF WASHINGTON
12                        AT TACOMA

13  OLYMPIC FOREST COALITION, a Washington
14  non-profit corporation,

15            Plaintiff,                    Case No. _____

16            v.

17  COAST SEAFOODS COMPANY, a Washington      COMPLAINT
   corporation,
18

19            Defendant.

20

21                    **I.    INTRODUCTION**

22        1.      This action is a citizen suit brought under Section 505 of the Clean Water Act, 33

23  U.S.C. § 1365.  Defendant Coast Seafoods Company owns and operates an oyster hatchery facil-

24  ity in or near Quilcene, Washington.  Defendant rears oyster larvae in tanks of water at its facil-

25  ity.  During that process, both Defendant and the oyster larvae add materials to the water.  De-

26  fendant then discharges that water and those additional materials into Quilcene Bay via pipes,

27

28  ditches, and channels.  Plaintiff Olympic Forest Coalition ("OFCO") alleges those discharges are

1  illegal and in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), because

2  Defendant does not have a National Pollutant Discharge Elimination System ("NPDES") permit

3  authorizing discharges of pollutants from its facility.  OFCO seeks declaratory and injunctive re-

4  lief, the imposition of civil penalties, and an award of costs, including attorneys' and expert wit-

5  ness fees, for Defendant's repeated and ongoing violations of the Clean Water Act.

6  

7       2.      As relevant here, the Clean Water Act ("CWA" or "Act") prohibits "the discharge

8  of any pollutant by any person" unless authorized by an NPDES permit.  See 33 U.S.C. §§

9  1311(a), 1342.  The Act defines the term "discharge of a pollutant" to include "*any* addition of

10  *any* pollutant to navigable waters from *any point source*."  See 33 U.S.C. §1362(12) (emphases

11  added).  The Act then defines the term "point source" to include "…*any* pipe, ditch [or] chan-

12  nel…from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphasis added).

13  Accordingly, discharges of pollutants from pipes, ditches, and channels at Defendant's facility

14  are prohibited unless authorized by an NPDES permit.

15  

16       3.      Notwithstanding the clarity of those prohibitions, Defendant claims EPA ex-

17  empted the pipes, ditches, and channels at its facility from the permit requirement by re-defining

18  them as nonpoint sources of pollution.  Defendant's reliance on EPA is misplaced, however.  Be-

19  cause the CWA itself clearly and unambiguously defines "point source" to include "any pipe,

20  ditch, or channel," 33 U.S.C. § 1362(14), EPA does not have the authority to contradict that

21  proclamation and say that Defendant's pipes, ditches, and channels are non-point sources that do

22  not require a permit.  Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842-843

23  (1984) ("When a court reviews an agency's construction of the statute which it administers, it is

24  confronted with two questions.  First, always, is the question whether Congress has directly spo-

25  ken to the precise question at issue.  If the intent of Congress is clear, that is the end of the mat-

26  ter; for the court, as well as the agency, must give effect to the unambiguously expressed intent

27  

28  

COMPLAINT - 2

of Congress.").  The CWA simply does not allow Defendant to use pipes, ditches, and channels to pollute Quilcene Bay without limit or oversight.

4.      Defendant also incorrectly believes that <u>Association to Protect Hammersly, Eld, and Totten Inlets v. Taylor Shellfish</u>, 299 F.3d 1007 (9th Cir. 2002) ("APHETI"), excuses it from NPDES permit requirements.  But the facts presented here are materially different from that case.  In <u>APHETI</u>, the alleged "point sources" were rafts of mussels living in Puget Sound.  Because the Act does not address whether living rafts of mussels are "point sources"—because there is a gap or ambiguity in the statute on that point—the <u>APHETI</u> court deferred to EPA and held that the defendant in that case did not need a permit because it was not discharging from a "point source." <u>Chevron</u>, 467 U.S. at 843 ("… if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").  Here, however, because Defendant is discharging chlorine and other pollutants from pipes, ditches, and channels—conveyances the CWA clearly and unambig-uously defines as "point sources," <u>see</u> 33 U.S.C. § 1362(14)—the text of the statute controls and EPA's contrary view is not entitled to deference.  <u>Chevron</u>, at 842-843.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 33 U.S.C. § 1365 (CWA citizen suit provi-sion) and 28 U.S.C. § 1331 (federal question).  Defendant is in violation of an "effluent standard or limitation" as defined by Section 505 of the Act, 33 U.S.C. § 1365.  The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 and 33 U.S.C. § 1365.

6.      OFCO has satisfied the jurisdictional requirements for bringing this suit.  Under Section 505(b)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A), by certified letter dated and post-marked October 20, 2015, OFCO notified Defendant and its registered agent of Defendant's al-leged violations of the Act and of OFCO's intent to sue for those violations ("Notice Letter").

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

OFCO also notified the Administrator of the EPA, the Administrator of EPA Region 10, and the Director of the Washington Department of Ecology of its intent to sue Defendant by mailing a copy of the Notice Letter to those officials on October 20, 2015.  A copy of the Notice Letter is attached to this complaint as <u>Exhibit 1</u> and the allegations therein are hereby incorporated by reference.

7.      More than sixty days have passed since OFCO mailed the Notice Letter and the violations complained of are continuing or reasonably likely to continue to occur.  Neither the EPA nor the Washington Department of Ecology has commenced any action constituting diligent prosecution to redress these violations.  Defendant is in violation of the Clean Water Act.

8.      Venue is appropriate in this District under Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations complained of is located in this District, in Jefferson County, Washington.

9.      A copy of this Complaint will be served on the Attorney General of the United States, the Administrator of the EPA, and the Administrator of EPA Region 10, as required by 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.4.

### III.      PARTIES

10.      Plaintiff Olympic Forest Coalition is a membership organization suing on behalf of itself and its members.  OFCO is a non-profit corporation organized and existing under the laws of the State of Washington.  OFCO maintains its principal place of business in Jefferson County, Washington.  The mission of OFCO is to protect and conserve the environment and natural resources of the Olympic Peninsula and the Pacific Northwest.  Since 2002, the staff, volunteers, and members of OFCO have advocated for cleaner water and air and for the preservation of public lands and wildlife habitat on and around the Olympic Peninsula.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

11.     OFCO and its members have a particular interest in, and derive aesthetic, recreational, and other benefits from, Quilcene Bay, Puget Sound, and the other rivers, creeks, bays, and canals of the Olympic Peninsula, including the aquatic and terrestrial species that use and rely on those waters.  OFCO's members use Quilcene Bay, Puget Sound, and other waters and adjacent lands downstream from Defendant's discharges for recreational and other activities, including boating, scientific expeditions, photographing birds and animals, nature watching, hiking, fishing, and aesthetic, spiritual, and recreational enjoyment.  Two of OFCO's members moor their sailboat at the marina south of and adjacent to Defendant's facility.  These two OFCO members routinely use the area of Quilcene Bay near Defendant's facility for boating, water quality monitoring, bird and wildlife watching, and other activities, all of which are impaired by the alleged discharges and the polluted state of Quilcene Bay.  Additionally, many other members of OFCO use Quilcene Bay or Puget Sound near or downstream from Defendant's facility and are also adversely impacted by the alleged discharges of pollutants.  OFCO and its members intend to continue all of these activities into the future.

12.     OFCO has standing to bring this lawsuit.  OFCO and its members are "citizens" as defined by Section 505(g) of the Act, 33 U.S.C. § 1365(g).  OFCO has at least one member who is injured by Defendant's discharges of pollutants and violations of the CWA.  Recreational, economic, aesthetic, conservation, health, and/or other interests of OFCO and its members have been, are being, and will be adversely affected by Defendant's violations of the Clean Water Act and unauthorized discharges of pollutants to Quilcene Bay and Puget Sound.  Plaintiff's and its members' interests in Quilcene Bay, Puget Sound, and the Olympic Peninsula are diminished by their polluted state and by Defendant's illegal discharges of pollutants and other violations of the CWA.  The relief sought in this lawsuit can redress the injuries to OFCO's interests.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

13.     Defendant Coast Seafoods Company is a corporation organized and existing under the laws of the State of Washington.  Defendant operates an oyster hatchery facility at or near 1601 Linger Longer Road, Quilcene, Washington 98376.  Defendant's facility discharges pollutants to Quilcene Bay on Hood Canal, which is part of Puget Sound.

## IV.     LEGAL BACKGROUND

A.     The CWA Prohibits Adding Pollutants from Point Sources to Waters of the U.S.

14.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

15.     As relevant here, Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits "the discharge of any pollutant by any person" unless such discharge is authorized by an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. §1342.

16.     The Act defines the term "discharge of a pollutant" to mean, in part, "any addition of any pollutant to navigable waters from any point source…."  33 U.S.C. § 1362(12).

17.     As relevant here, the Act defines the term "point source" to mean, in part, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  * * *."  33 U.S.C. § 1362(14).

18.     As relevant here, the Act defines the term "pollutant" to mean, in part, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. * * *."  33 U.S.C. § 1362(6).

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

19.     Neither the Act nor its implementing regulations define the term "addition"; however, one court found that "addition" means the introduction of a pollutant into navigable waters from any place outside the particular water body.  Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 491 (2nd Cir. 2001).

20.     The Act's prohibition on discharging pollutants from point sources applies broadly.  The Act defines the term "navigable waters" to mean "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  And the Act defines the term "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. § 1362(5).

21.     The text of the Act does not exempt oyster hatchery facilities from the NPDES permit requirement.  Point-source discharges of pollutants from oyster hatchery facilities are illegal unless authorized by an NPDES permit.  33 U.S.C. § 1311(a).

B.      The CWA Empowers EPA and Some States to Authorize Discharges of Pollutants by Issuing NPDES Permits.

22.     Section 402(a) of the Act authorizes EPA to issue NPDES permits authorizing discharges of pollutants.  33 U.S.C. §1342(a).  By contrast, "non-point sources" of pollution do not require NPDES permits.  Non-point source pollution is diffuse run-off and other pollution that is not delivered to water bodies via point sources.  Instead of requiring NPDES permits, Section 304(f) of the Act, 33 U.S.C. § 1314(f), directs EPA to disseminate information regarding non-point pollution sources, which are generally subject to state management programs developed under Sections 208 and 303(e) of the Act, 33 U.S.C. §§ 1288 and 1313(e).  Pollution delivered to waters of the United States from pipes, ditches, and channels is not "non-point source" pollution.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

23.     EPA may delegate administration of the NPDES permit program to states with regulatory programs meeting applicable criteria.  33 U.S.C. § 1342(b); 40 C.F.R. Part 123. The State of Washington has established a federally approved state NPDES program administered by the Washington Department of Ecology.  Accordingly, the Washington Department of Ecology may issue NPDES permits authorizing discharges of pollutants.

24.     Federal regulations require any person who discharges or proposes to discharge pollutants to waters of the United States to apply for an NPDES permit.  40 C.F.R. § 122.21(a).

25.     Compliance with the terms and conditions of an NPDES permit is deemed compliance with the general discharge prohibition in Section 301(a).  33 U.S.C. § 1342(k).  Discharging pollutants without the required NPDES permit is grounds for a citizen enforcement action.  33 U.S.C. §§ 1365(a)(1), (f)(1).

C.     EPA Regulations Require NPDES Permits for "Any Addition of Any Pollutant to Waters of the United States from Any Point Source" and for "Concentrated Aquatic Animal Production Facilities."

26.     EPA adopted regulations implementing the NPDES permit program.  The EPA regulation that sets forth the scope of the NPDES permit requirement, 40 C.F.R. § 122.1(b)(1), "…requires permits for the discharge of 'pollutants' from any 'point source' into 'waters of the United States.'"  Similarly, EPA regulations define the term "discharge of a pollutant" in part as follows:  "Any addition of any 'pollutant' or combination of pollutants to 'waters of the United States' from any 'point source'…."  40 C.F.R. § 122.2.

27.     EPA regulations define the term "point source" just as the statute does.  See 40 C.F.R. § 122.2 and 33 U.S.C. § 1362(14).

28.     In addition, EPA regulations also define as a "point source" some aquatic animal production facilities.  40 C.F.R. § 122.24(a) states: "Concentrated aquatic animal production facilities, as defined in this section, are point sources subject to the NPDES permit program."  The

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

regulation then defines the term "concentrated aquatic animal production facility" as "a hatchery, fish farm, or other facility which meets the criteria in appendix C of this part, or which the Director designates under paragraph (c) of this section."  40 C.F.R. § 122.24(b).  Appendix C to 40 C.F.R. Part 122 then lists the criteria for determining whether a facility qualifies as a "concentrated aquatic animal production facility" and hence is a "point source" that requires an NPDES permit.

29.     EPA regulations do not exempt point-source discharges of pollutants from oyster hatchery facilities from the NPDES permit requirement.  EPA regulations list exclusions from the NPDES permit requirement, see 40 C.F.R. § 122.3, but that regulation says nothing whatsoever about oyster hatchery facilities.  The EPA regulation defining "concentrated aquatic animal production facilities" also does not exempt any point-source discharge of pollutants from the NPDES permit requirement.  That regulation does not include any text affirmatively stating that discharges of pollutants from oyster hatchery facilities that do not meet the criteria in Appendix C to 40 C.F.R. Part 122 are exempt from NPDES permitting.  Inferring that the regulation implicitly exempts an oyster hatchery facility that discharges pollutants via pipes, ditches, and channels, but that does not otherwise meet the criteria in Appendix C to 40 C.F.R. Part 122, is impermissible because such an inference brings the regulation into conflict with the Act.  Chevron, at 842-843.

## V.     FACTS

30.     Defendant owns and operates an oyster hatchery facility at or near 1601 Linger Longer Road, Quilcene, Washington 98376 (hereinafter the "facility").  Defendant's facility is on land and adjacent to Quilcene Bay, which is part of Hood Canal and Puget Sound.  After acquiring the facility, Defendant increased oyster hatchery production significantly.  According to

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Defendant, the facility is now the world's largest shellfish hatchery, capable of producing over 45 billion eyed oyster larvae per year.

31.     To grow the food it feeds to oyster larvae at its facility, Defendant adds heat, nutrients, carbon dioxide and oxygen to a solution containing phytoplankton.  Defendant then adds the phytoplankton solution to waters in the facility to nourish growing oyster larvae.  Additionally, the phytoplankton's natural processes add oxygen to waters in the facility.

32.     Defendant adds other materials to the water it uses to grow oyster larvae in the facility.  On information and belief, to control pH Defendant adds sodium carbonate or other materials to the water used to grow oyster larvae at the facility.  On information and belief, to control microorganisms Defendant adds antibiotics or other materials to the water used to grow oyster larvae at the facility.  On information and belief, to facilitate oyster reproduction Defendant adds heat to the water used to grow oyster larvae at the facility.  On information and belief, to sterilize or otherwise clean tanks, equipment, or water used to grow phytoplankton, Defendant adds sodium hypochlorite and/or other chlorine-based chemicals to waters in the facility.

33.     Defendant periodically adds the water it uses to grow oyster larvae in the facility, as well as the materials Defendant and its oysters add to those waters, to Quilcene Bay.  Quilcene Bay, Hood Canal, and Puget Sound are "navigable waters" or "waters of the United States" as defined by the Clean Water Act and its implementing regulations.

34.     Defendant uses pipes, ditches, and channels to convey effluent from the facility to Quilcene Bay.  The Notice Letter identifies some of the locations of these point sources.  See Exhibit 1.  Below is a photograph of Defendant's facility that an OFCO member took on September 21, 2012.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   The point sources at the facility include the many pipes discharging onto the beach and into

18   Quilcene Bay; the man-made and eroded channels discharging onto the beach and into Quilcene

19   Bay; and the facility's seawater intake pipe, which discharges when the facility back-flushes that

20   pipe.  Effluent added to Quilcene Bay from pipes, ditches, and channels at the facility is not

21

22   "non-point source pollution."

23        35.    Effluent from the facility contains pollutants, including but not limited to total

24   suspended solids, nitrogen, phosphorous, ammonia, nitrites, nitrates, Chlorophyll *a*, Phaeophytin

25   *a*, heat, pH, salinity, dissolved oxygen, and chlorine.  These and the other materials in the facil-

26   ity's effluent constitute chemical wastes, biological materials, heat, industrial waste, and other

27   "pollutants" as defined by the CWA.

28

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

36.     Two of OFCO's members moor their sailboat at a marina just south of Defendant's facility.  These OFCO members regularly access and use their sailboat to boat on Quilcene Bay, Dabob Bay, Hood Canal, and other parts of Puget Sound.  While boating these OFCO members regularly sample the water quality in Quilcene Bay and observe and photograph birds and wildlife in the area.

37.     OFCO members can see Defendant's facility and discharges of effluent from the facility from Quilcene Bay and from the property immediately south of the facility.  These OFCO members have watched Defendant discharge effluent from the facility to Quilcene Bay from pipes, ditches, and channels.  These OFCO members have also taken water quality samples where Defendant's facility discharges to Quilcene Bay.

38.     Water quality samples from June and July 2014 indicate that Defendant discharged chlorine to Quilcene Bay and Puget Sound on the following days and in at least the following amounts:

| Date | Location Sampled[1] | Amount of Free Chlorine (ml/L) | Amount of Total Chlorine (ml/L) | Amount of Total Chlorine (ug/L) |
|---|---|---|---|---|
| 6/25/2014 | South Channel | 0.01 | 0.08 | 80 |
| 6/25/2014 | North Channel | 0.03 | 0.12 | 120 |
| 6/25/2014 | North Channel | 0 | 0.06 | 60 |
| 6/29/2014 | Buoy | 0 | 0.03 | 30 |
| 6/29/2014 | Buoy | 0.01 | 0.07 | 70 |
| 7/2/2015 | South Channel | 0.02 | 0.15 | 150 |
| 7/2/2014 | North Channel | 0 | 0.04 | 40 |
| 7/9/2014 | South Channel | 0 | 0.04 | 40 |

[1]      "South Channel" refers to the location where a channel on the beach at the south end of the facility discharges to Quilcene Bay.  "North Channel" refers to the location where a channel on the beach at the north end of the facility discharges to Quilcene Bay.  "Buoy" refers to the location where a buoy marks the facility's intake pipe in Quilcene Bay.

COMPLAINT - 12

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

| Date | Location | | | |
|---|---|---|---|---|
| 7/9/2014 | North Channel | 0.04 | 0.1 | 100 |
| 7/9/2014 | Buoy | 0.04 | 0.15 | 150 |
| 7/9/2014 | South Channel | 0.01 | 0.08 | 80 |
| 7/9/2014 | North Channel | 0.04 | 0.12 | 120 |
| 7/9/2014 | Buoy | 0.02 | 0.1 | 100 |
| 7/9/2014 | South Channel | 0.02 | 0.1 | 100 |
| 7/9/2014 | North Channel | 0.02 | 0.12 | 120 |
| 7/9/2014 | Buoy | 0.02 | 0.1 | 100 |
| | | | | |
| 7/11/2014 | South Channel | 0.19 | 0.29 | 290 |
| 7/11/2014 | North Channel | 0.05 | 0.08 | 80 |
| | | | | |
| 7/16/2014 | South Channel | 0.04 | 0.13 | 130 |
| 7/16/2014 | South Channel | 0.04 | 0.12 | 120 |
| 7/16/2014 | North Channel | 0 | 0.05 | 50 |
| 7/16/2014 | North Channel | 0 | 0.05 | 50 |
| 7/16/2014 | North Channel | 0.05 | 0.11 | 110 |
| 7/16/2014 | North Channel | 0 | 0.09 | 90 |
| 7/16/2014 | Buoy | 0 | 0.09 | 90 |
| 7/16/2014 | Buoy | 0.01 | 0.1 | 100 |
| 7/16/2014 | Buoy | 0 | 0.08 | 80 |
| | | | | |
| 7/17/2014 | South Channel | 0.02 | 0.1 | 100 |
| 7/17/2014 | South Channel | 0.01 | 0.07 | 70 |
| 7/17/2014 | North Channel | 0.01 | 0.09 | 90 |
| 7/17/2014 | North Channel | 0 | 0.05 | 50 |
| 7/17/2014 | North Channel | 0.01 | 0.08 | 80 |
| 7/17/2014 | North Channel | 0.01 | 0.03 | 30 |
| 7/17/2014 | Buoy | 0.01 | 0.06 | 60 |
| 7/17/2014 | Buoy | 0 | 0.05 | 50 |
| 7/17/2014 | Buoy | 0 | 0.08 | 80 |

39.     After watching Defendant's facility discharge to Quilcene Bay, and after becoming convinced that effluent from the facility is polluted, OFCO members worked for several years to resolve alleged pollution problems at Defendant's facility.  OFCO members met with, or attempted to meet with, Defendant to discuss ways to reduce discharges of pollution from Defendant's facility.  OFCO members also sought help from the Washington Department of Ecology.  These efforts did not result in Defendant obtaining or complying with an NPDES permit.

COMPLAINT - 13

40.     In an effort to persuade the Washington Department of Ecology that Defendant's facility was not a significant contributor of pollution to Puget Sound, Defendant hired a consultant—Rensel Associates Aquatic Sciences—to assess the effluent discharged from Defendant's facility.  After sampling effluent from the facility, Rensel Associates Aquatic Sciences produced a report dated February 7, 2013 and entitled "Quilcene Bay Shellfish Hatchery Discharge Study" (hereinafter "Rensel Report").

41.     The Rensel Report confirms that the facility uses pipes, ditches, and channels to discharge effluent to Quilcene Bay.  On page 9 of the Rensel Report it states:

> There are numerous small PVC pipes leading from the hatchery that discharge above the high water mark of the beach and a few that discharge at lower elevations.  A schematic layout of Quilcene Shellfish Hatchery and associated facilities near the shore of Quilcene Bay is shown as Figure 4.  Most of the discharge pipes are arrayed to flow into two separate small channels that flow down the moderately sloped beach to Quilcene Bay (Fig. 4, sampling locations 1 and 2).

42.     The Rensel Report confirms that effluent from the facility contains pollutants, including but not limited to total suspended solids, nitrogen, phosphorous, ammonia, nitrites, nitrates, Chlorophyll *a*, Phaeophytin *a*, heat, pH, salinity, and dissolved oxygen.  For a variety of materials, the Rensel Report compared the chemical content of the water drawn into the facility to the chemical content of the effluent leaving the facility.  For dissolved inorganic nitrogen, total suspended solids, Chlorophyll a, and Phaeophytin a, the Rensel Report found that the chemical loading in individual samples of effluent from the facility was usually higher than the chemical loading in the water drawn into the facility.  For Total Nitrogen, Total Phosphorous, Soluble Reactive Phosphorous, Ammonia Nitrogen, and Nitrate + Nitrite Nitrogen, the Rensel Report found that the chemical loading in the effluent was *always* higher than the chemical loading in the water drawn into the facility.  For example, as documented at pages 22-23 of the Rensel Re-

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

port, effluent from the facility contained 68%, 439%, 178%, 178%, 669%, and 549% of the ammonia nitrogen found in the water drawn into the facility.  Depending on water pH and temperature, ammonia nitrogen can be highly toxic to fish and other aquatic species.

43.     The Rensel Report documents point-source discharges of pollutants from the facility to Quilcene Bay.  In preparing the Rensel Report, Rensel Associates Aquatic Sciences did not sample all sources of effluent from the facility.  In preparing the Rensel Report, Rensel Associates Aquatic Sciences did not sample for all pollutants that might be in effluent from the facility.  In preparing the Rensel Report, Rensel Associates Aquatic Sciences did not test the facility's effluent for chlorine.

44.     The discharge of biological materials and other pollutants from the facility is the result of a transformative human process.  The quantity, quality, and concentration of the materials in effluent from the facility is significantly different than that which normally occurs in Quilcene Bay or Puget Sound.

45.     Defendant has not applied for or received NPDES permit coverage for discharges of pollutants from the facility.  If Defendant had submitted a complete application for an NPDES permit, EPA or the Washington Department of Ecology would have had sufficient information to determine that Defendant is discharging pollutants from point sources and so requires an NPDES permit.

46.     Defendant's unpermitted discharges of pollutants degrade the environment and the water quality of Quilcene Bay and Puget Sound.  Defendant's unpermitted discharges of pollutants foul the water in and around the marina where two of OFCO's members moor their sailboat.  Defendant's unpermitted discharges of pollutants also foul the beach adjacent to Defendant's facility and other nearby property, including OFCO's members' sailboat.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

47.     Defendant's unpermitted discharges of pollutants were avoidable had Defendant been diligent in overseeing and controlling operations, maintenance, monitoring, and compliance with the law.

48.     Defendant has benefited economically from its unpermitted discharges of pollutants.

49.     Any and all additional violations of the Clean Water Act by Defendant that occur or are discovered after those described in the Notice Letter but before a final decision in this action are continuing violations subject to this complaint.

50.     Without the imposition of appropriate civil penalties and/or the issuance of an injunction and other relief, Defendant is likely to continue to violate the Clean Water Act to the further injury of Plaintiff, its members, and others.

## VI.     CAUSE OF ACTION

51.     Plaintiff hereby alleges and incorporates by reference all of the preceding paragraphs.

52.     Defendant Coast Seafoods Company is a "person" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and is subject to suit under the Act's citizen suit provision, 33 U.S.C. § 1365.

53.     Defendant Coast Seafoods Company has violated and is violating Sections 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by adding pollutants from point sources at its facility to Quilcene Bay and Puget Sound without an NPDES permit.  These violations have occurred each and every day the facility has operated since October 20, 2010.  These violations are ongoing, are described in the Notice Letter, and are hereby incorporated by reference as if fully set forth herein.  See Exhibit 1.

COMPLAINT - 16

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

1

## VII.   RELIEF REQUESTED

2      WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

3      A.      Declare that Defendant has violated and continues to be in violation of the Clean

4  Water Act, as alleged herein;

5      B.      Issue injunctive relief requiring Defendant to comply with the CWA, apply for an

6

7  NPDES permit authorizing discharges of pollutants from Defendant's Quilcene facility, or to

8  cease making such discharges;

9      C.      Issue injunctive relief requiring Defendant to remediate the environmental dam-

10  age and ongoing impacts resulting from its illegal discharges of pollutants to Quilcene Bay and

11  Puget Sound;

12      D.      Order Defendant to develop and comply with appropriate quality assurance proce-

13  dures to ensure future compliance with the Clean Water Act;

14

15      E.      Order Defendant to provide Plaintiff with copies of all reports and other docu-

16  ments that Defendant submits to EPA or the Washington Department of Ecology regarding dis-

17  charges of pollutants from Defendant's facility, at the time the reports or documents are submit-

18  ted to those authorities, for two years after completion of this case;

19      F.      Assess civil penalties against Defendant, as authorized by Section 309(d) of the

20  Act, 33 U.S.C. § 1319(d);

21

22      G.      Award Plaintiff its litigation expenses, including costs and reasonable attorneys'

23  and expert witness fees, as authorized by Section 505(d) of the Act, 33 U.S.C. § 1365(d); and

24      H.      Award such other relief as this Court deems just and appropriate.

25  //
26  //
27  //
28  //

COMPLAINT - 17

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

RESPECTFULLY SUBMITTED this 27th day of January, 2016.

_____s/ Paul A. Kampmeier_____
Paul A. Kampmeier, WSBA #31560
Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
Tel: (206) 223-4088 x 4
paul@kampmeierknutsen.com

_____s/Brian A. Knutsen_____
Brian A. Knutsen, WSBA # 38806
Kampmeier & Knutsen PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
Telephone:  (503) 841-6515
Email:  brian@kampmeierknutsen.com

*Attorneys for Plaintiff Olympic Forest Coalition*

COMPLAINT - 18

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

# EXHIBIT 1

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

PAUL A. KAMPMEIER
Licensed in Washington
206.223.4088 x 4
paul@kampmeierknutsen.com

October 20, 2015

*Via Certified Mail - Return Receipt Requested*

Managing Agent
Coast Seafoods Company
1601 Linger Longer Road
Quilcene, Washington 98376

Managing Agent
Coast Seafoods Company
P.O. Box 327
Quilcene, Washington 98376

Mr. John A. Petrie, President
Coast Seafoods Company
14711 NE 29th Place, Suite 111
Bellevue, Washington 98007

**Re:    Notice of Intent to File Suit under the Clean Water Act.**

Dear Managing Agent:

This letter provides Coast Seafoods Company (hereinafter "Coast Seafoods") with sixty days' notice of the Olympic Forest Coalition's intent to file a citizen lawsuit against it under Section 505 of the Clean Water Act, 33 U.S.C. §1365, for the Clean Water Act violations alleged in this letter. The Olympic Forest Coalition (hereinafter "OFCO") is a non-profit organization dedicated to protecting the natural environment of the Olympic Peninsula in Washington State. Kampmeier & Knutsen, PLLC represents OFCO in this matter and any response to this notice of intent to sue should be directed to us at the address below.

## I.    VIOLATIONS OF THE CLEAN WATER ACT.

Congress enacted the Clean Water Act in 1948 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §1251(a). In doing so, Congress declared a

national goal of eliminating discharges of pollutants to navigable waters by 1985.  To effect that policy, Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), prohibits discharges of pollutants unless they are in compliance with Section 402 of the Act, 33 U.S.C. 1342.  The Clean Water Act defines "discharge of a pollutant" to mean in part "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  In general, discharges of pollutants are in compliance with Section 402 if:  (1) they are authorized by a National Pollutant Discharge Elimination System permit (hereinafter "NPDES permit"); or (2) Congress has exempted, or authorized the U.S. Environmental Protection Agency to exempt, the discharges from the NPDES permit requirement.

A.     Discharge Violations.

Coast Seafoods has violated and is violating Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342, by discharging pollutants from the Coast Seafoods facility at or near 1601 Linger Longer Road, Quilcene, Washington 98376 (hereinafter the "facility") to Quilcene Bay and Puget Sound without an NPDES permit.  These violations have occurred each and every day the facility has operated since October 20, 2010, and are ongoing.

Coast Seafoods uses numerous pipes, ditches, channels and other discernible, confined and discrete conveyances to discharge effluent from its indoor, land-based oyster facilities to the adjacent beach, Quilcene Bay, and Puget Sound.  The point sources at the facility include the many pipes discharging onto the beach and into Quilcene Bay; the man-made and eroded channels discharging onto the beach and into Quilcene Bay; and the facility's intake pipe, which discharges when the facility back-flushes that pipe.  The February 7, 2013 Quilcene Bay Shellfish Hatchery Discharge Study that Dr. Jack Rensel (of Rensel Associates Aquatic Sciences) produced for Coast Seafoods confirms that the facility uses pipes, ditches, channels and other "point sources" to discharge to those waters.

The Rensel report also demonstrates that effluent from the facility contains pollutants, including but not limited to total suspended solids, nitrogen, phosphorous, ammonia, nitrites, nitrates, Chlorophyll $a$, Phaeophytin $a$, heat, pH, salinity, and dissolved oxygen.  As explained and documented in the Rensel report, which is hereby incorporated by reference, Coast Seafoods discharged pollutants, including but not limited to total suspended solids, nitrogen, phosphorous, ammonia, nitrites, nitrates, Chlorophyll $a$, Phaeophytin $a$, heat, pH, salinity, and dissolved oxygen, to Quilcene Bay and Puget Sound from pipes, ditches, channels and other "point sources" at the facility on September 24, 2012 and in the amounts documented in the Rensel report.  The Rensel report further demonstrates that pollutants in the facility's effluent differ in quality, quantity and concentration from the seawater drawn into the facility.

Additionally, water quality samples from June and July 2014 indicate that Coast Seafoods discharged chlorine to Quilcene Bay and Puget Sound from pipes, ditches, channels and other "point sources" at the facility on the following days and in at least the following amounts:

- 2 -

| Date | Location Sampled[1] | Amount of Free Chlorine (ml/L) | Amount of Total Chlorine (ml/L) | Amount of Total Chlorine (ug/L) |
|---|---|---|---|---|
| 6/25/2014 | South Channel | 0.01 | 0.08 | 80 |
| 6/25/2014 | North Channel | 0.03 | 0.12 | 120 |
| 6/25/2014 | North Channel | 0 | 0.06 | 60 |
| | | | | |
| 6/29/2014 | Buoy | 0 | 0.03 | 30 |
| 6/29/2014 | Buoy | 0.01 | 0.07 | 70 |
| | | | | |
| 7/2/2015 | South Channel | 0.02 | 0.15 | 150 |
| 7/2/2014 | North Channel | 0 | 0.04 | 40 |
| | | | | |
| 7/9/2014 | South Channel | 0 | 0.04 | 40 |
| 7/9/2014 | North Channel | 0.04 | 0.1 | 100 |
| 7/9/2014 | Buoy | 0.04 | 0.15 | 150 |
| 7/9/2014 | South Channel | 0.01 | 0.08 | 80 |
| 7/9/2014 | North Channel | 0.04 | 0.12 | 120 |
| 7/9/2014 | Buoy | 0.02 | 0.1 | 100 |
| 7/9/2014 | South Channel | 0.02 | 0.1 | 100 |
| 7/9/2014 | North Channel | 0.02 | 0.12 | 120 |
| 7/9/2014 | Buoy | 0.02 | 0.1 | 100 |
| | | | | |
| 7/11/2014 | South Channel | 0.19 | 0.29 | 290 |
| 7/11/2014 | North Channel | 0.05 | 0.08 | 80 |
| | | | | |
| 7/16/2014 | South Channel | 0.04 | 0.13 | 130 |
| 7/16/2014 | South Channel | 0.04 | 0.12 | 120 |
| 7/16/2014 | North Channel | 0 | 0.05 | 50 |
| 7/16/2014 | North Channel | 0 | 0.05 | 50 |
| 7/16/2014 | North Channel | 0.05 | 0.11 | 110 |
| 7/16/2014 | North Channel | 0 | 0.09 | 90 |
| 7/16/2014 | Buoy | 0 | 0.09 | 90 |
| 7/16/2014 | Buoy | 0.01 | 0.1 | 100 |
| 7/16/2014 | Buoy | 0 | 0.08 | 80 |
| | | | | |
| 7/17/2014 | South Channel | 0.02 | 0.1 | 100 |
| 7/17/2014 | South Channel | 0.01 | 0.07 | 70 |
| 7/17/2014 | North Channel | 0.01 | 0.09 | 90 |

---

[1] "South Channel" refers to the location where a channel on the beach at the south end of the facility discharges to Quilcene Bay. "North Channel" refers to the location where a channel on the beach at the north end of the facility discharges to Quilcene Bay. "Buoy" refers to the location where a buoy marks the facility's intake pipe in Quilcene Bay.

| 7/17/2014 | North Channel | 0 | 0.05 | 50 |
| 7/17/2014 | North Channel | 0.01 | 0.08 | 80 |
| 7/17/2014 | North Channel | 0.01 | 0.03 | 30 |
| 7/17/2014 | Buoy | 0.01 | 0.06 | 60 |
| 7/17/2014 | Buoy | 0 | 0.05 | 50 |
| 7/17/2014 | Buoy | 0 | 0.08 | 80 |

In addition to chlorine and the pollutants documented by the Rensel report, this notice of intent to sue covers the discharge of any and all pollutants from the facility, including biological wastes, food wastes, chemicals used for oyster rearing or tank cleaning or other purposes, concentrated total suspended solids, antibiotics and drugs and any residue of those materials, and any other pollutants discharged by the facility into Quilcene Bay and Puget Sound over the last five years.

All of these discharges of pollutants from the facility are ongoing, illegal, and in violation of Section 301(a) of the Clean Water Act. The Clean Water Act clearly and unambiguously defines the pipes, ditches, and channels that discharge at the facility as "point sources." See 33 U.S.C. § 1362(14). The Clean Water Act also clearly and unambiguously defines the chemical wastes, biological materials, heat, and industrial waste in Coast Seafoods' effluent as "pollutants." See 33 U.S.C. § 1362(6). Quilcene Bay and Puget Sound are both "navigable waters" and "waters of the United States." And, by discharging its effluent to Quilcene Bay and the beach adjacent to the facility, Coast Seafoods is clearly "adding" pollutants to those waters.

Additionally, discharges of pollutants from the facility are not exempt from the NPDES permit requirement. The Clean Water Act does not exempt discharges of pollutants from oyster hatcheries or similar facilities from the NPDES permit requirement. Nor do EPA rules. If the facility meets the feeding and production thresholds in EPA's Concentrated Aquatic Animal Production Facilities rule, see 40 C.F.R. § 122.24 and Appendix C to 40 C.F.R. Part 122, then discharges of pollutants from the facility are illegal because that rule plainly requires Coast Seafoods to obtain an NPDES permit authorizing the discharges. On the other hand, if the facility does not meet the feeding and production thresholds in EPA's Concentrated Aquatic Animal Production Facilities rule, then the Clean Water Act itself requires discharges of pollutants from the facility to be authorized by an NPDES permit. See 33 U.S.C. §§ 1311(a), 1362(6), (14).

EPA regulations do not—and cannot—exempt discharges of pollutants from the facility from the NPDES permit requirement because EPA regulations cannot contravene the unambiguous definitions and prohibitions in the Clean Water Act. See Northwest Environmental Defense Center v. Brown, 640 F.3d 1063, 1070-71, 1080 (9th Cir. 2011), reversed on other grounds, Decker, et al., v. Northwest Environmental Defense Center, 133 S. Ct. 1326 (2013); Northwest Environmental Advocates v. EPA, 537 F.3d 1006, 1020-23 (9th Cir. 2008); League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1183-1185 (9th Cir. 2002); Natural Resources Defense Council v. Costle, 568 F.2d 1369, 1377, 1383 (D.C. Cir. 1977); United States v. Earth Sciences, 599 F.2d 368, 373 (10th Cir. 1978) (holding "[w]e believe it contravenes the intent of [the Clean Water Act] and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point."); Trustees for Alaska v. EPA, 749 F.2d 549, 558 (9th Cir. 1984) (adopting the reasoning of the Earth Sciences court); National Cotton Council of America v. EPA, 553 F.3d 927, 933-940 (6th Cir. 2009). Here, because the facility is discharging materials the statute unambiguously defines as "pollutants" from conveyances the statute

unambiguously defines as "point sources," the facility must have an NPDES permit authorizing those discharges. Because the facility does not have such a permit, discharges of pollutants from the facility are illegal and in violation of the Clean Water Act.

Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Resources, 299 F.3d 1007 (9th Cir. 2002), is not to the contrary. Unlike Hammersly, where the alleged "point source" was a mussel raft not included within the statutory definition of "point source"—where the Act was ambiguous as to whether the mussel raft was a point source of pollution and so deferring to EPA's Concentrated Aquatic Animal Production Facilities rule was appropriate—here the Coast Seafoods facility discharges pollutants from pipes, ditches, and channels that the Clean Water Act unambiguously defines as point sources. See 33 U.S.C. § 1362(14). Neither EPA's rule nor the Hammersly decision allows EPA, the Washington Department of Ecology, or Coast Seafoods to re-define the pipes, ditches, and channels at the facility as nonpoint sources of pollution that do not require an NPDES permit.

Also unlike Hammersly, where the alleged "pollutants" were biological wastes generated and discharged naturally by living creatures residing in the receiving waters—where the Act was ambiguous as to whether the facility was "adding" "pollutants" to the receiving waters—the Coast Seafoods facility is adding materials to Quilcene Bay and Puget Sound that the Clean Water Act unambiguously defines as "pollutants," including chemical wastes, biological materials, heat, and industrial waste. See 33 U.S.C. § 1362(6). Additionally, because Coast Seafoods' oyster hatchery facilities are on land, and because Coast Seafoods adds food, nutrients, chemicals, and other materials to the hatchery tanks and effluent before discharging to Quilcene Bay and Puget Sound, the discharge of biological materials and other pollutants is the result of a transformative human process. To the extent the pollutants in the facility's effluent are solely biological materials—which is very unlikely given the water quality samples discussed above—the quantity, quality, and concentration of those materials is significantly different than those normally occurring in Puget Sound, demonstrating yet again that the facility is discharging pollutants in a manner and to an extent that requires an NPDES permit.

B.     Failure to Apply for NPDES Permit Coverage.

Federal regulations require any person who discharges or proposes to discharge pollutants to navigable waters of the United States to apply for an NPDES permit. 40 C.F.R. § 122.21(a). Coast Seafoods has violated and is violating this requirement by failing to apply for an NPDES permit and by failing to do so by the required deadline.

II.    PARTY GIVING NOTICE.

The full name and address of the party giving notice is:

Olympic Forest Coalition
P.O. Box 461
Quilcene, Washington 98376

The Olympic Forest Coalition does not have a telephone or telephone number but it can be reached by telephone through counsel Kampmeier & Knutsen PLLC at the telephone numbers below.

III.   **ATTORNEYS REPRESENTING OFCO.**

The attorneys representing OFCO in this matter are:

Paul Kampmeier
Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
Telephone: (206) 223-4088 extension 4

Brian A. Knutsen
Kampmeier & Knutsen PLLC
833 S.E. Main Street
Mail Box No. 318; Suite 327
Portland, Oregon 97214
Telephone: (503) 841-6515

IV.   **CONCLUSION.**

The violations described and alleged in this notice of intent to sue are ongoing and violate the Clean Water Act. At the conclusion of the 60-day notice period, OFCO intends to file a lawsuit against Coast Seafoods Company under the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365. Each of the above-described violations subjects the violator to a penalty of up to $37,500 per day. In addition to civil penalties, OFCO will seek injunctive relief to prevent further violations and such other relief as is permitted by law, including recovery of OFCO's costs, attorneys' fees, and expert witness fees. See 33 U.S.C. §§ 1365(a) and (d).

The above-described violations reflect the information currently available to OFCO. OFCO intends to sue for all violations, including those yet to be uncovered, those committed after the date of this Notice of Intent to Sue, and those occurring at any other properties that are owned or operated by Coast Seafoods and contiguous or adjacent to the facility.

During the 60-day notice period, OFCO will be willing to discuss settlement and effective remedies for the violations described and alleged in this letter. In this regard, it is worth noting that in response to similar litigation, and notwithstanding EPA's Concentrated Aquatic Animal Production Facilities rule, the Quilcene National Fish Hatchery recently entered into a settlement agreement requiring it to apply for and obtain NPDES permit coverage for discharges of pollutants from that facility to the Big Quilcene River. If you would like to review those materials we would be happy to share them with you. In any event, if you wish to pursue settlement discussions in the absence of litigation, we suggest that you initiate discussions within 10 days of receiving this notice so the parties can meet and discuss effective remedies for the violations alleged herein before costs of suit become prohibitive. OFCO does not intend to delay the filing of a complaint if discussions are ongoing when the notice period ends.

Very truly yours,

Kampmeier & Knutsen, PLLC

By:

Paul A. Kampmeier
Brian A. Knutsen

cc:   Gina McCarthy, Administrator, U.S. Environmental Protection Agency
      Dennis McLerran, Region 10 Administrator, U.S. Environmental Protection Agency
      Maia Bellon, Director, Washington Department of Ecology
      National Registered Agents, Inc., Registered Agent for Coast Seafoods Company

- 7 -

## CERTIFICATE OF SERVICE

I, Paul Kampmeier, declare under penalty of perjury of the laws of the United States that I am counsel for the Olympic Forest Coalition and that on October 20, 2015, I caused copies of the foregoing Notice of Intent to Sue Under the Clean Water Act to be served on the following by depositing it with the U.S. Postal Service, postage prepaid, via certified mail, return receipt requested:

Managing Agent
Coast Seafoods Company
1601 Linger Longer Road
Quilcene, Washington 98376

Managing Agent
Coast Seafoods Company
P.O. Box 327
Quilcene, Washington 98376

Mr. John A. Petrie, President
Coast Seafoods Company
14711 NE 29th Place, Suite 111
Bellevue, Washington 98007

Administrator Regina A. McCarthy
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W., Mail Code 1101A
Washington, D.C. 20460

Regional Administrator Dennis J. McLerran
U.S. Environmental Protection Agency, Region 10
1200 Sixth Avenue, Mail Code RA-210
Seattle, Washington 98101

Director Maia Bellon
Washington Department of Ecology
P.O. Box 47600
Olympia, Washington 98504-7600

National Registered Agents, Inc.
Registered Agent for Coast Seafoods Company
505 Union Avenue SE, Suite 120
Olympia, Washington 98501

Paul Kampmeier